# CHARLESTON.

CHARLESTON & SOUTHSIDE BRIDGE CO. *v.* COMSTOCK *et al.*

Submitted February 11, 1892.—Decided March 26, 1892.

1. EMINENT DOMAIN—CONDEMNATION OF LAND.

It is a general rule that he who seeks to exercise the extraordinary power of taking private property for public use must follow strictly the mode of procedure prescribed by law. (p. 275.)

2. EMINENT DOMAIN—CONDEMNATION OF LAND—INQUISITION.

Where, upon a fair and reasonable construction of the inquisition and proceedings they are substantially responsive to the requirements of the statute, that is sufficient. (p. 276.)

3. EMINENT DOMAIN—CONDEMNATION OF LAND—INQUISITION.

Chapter 42 of the Code of 1891 especially section 5, determines the form of the application, and what it must contain. This chapter, and especially this section, in what it contains and in what may fairly arise by necessary implication, is exhaustive of such formal requirements, unless otherwise expressly provided elsewhere. (p. 274.)

4. EMINENT DOMAIN—CONDEMNATION OF LAND—INQUISITION.

It is not necessary for the applicant, in his petition for condemnation, to expressly state that he can not agree with the owner on terms of purchase, as might be inferred from section 7 of chapter 52, when read alone. (p. 274.)

5. EMINENT DOMAIN—CONDEMNATION OF LAND—PARTIES—NOTICE —INFANTS.

The statute requires that the owner of each parcel of real estate proposed to be taken shall be made a party to the proceeding, and be served with notice of the application at the time and in the modes prescribed by such chapter, but it does not require service of such notice on an infant owner in person. (p. 272, 273.)

6. EMINENT DOMAIN—CONDEMNATION OF LAND—PARTIES—NOTICE —INFANTS.

If at any time during the proceeding it is suggested that there are infant owners, who are in the county and have attained the age of discretion, who ought to be personally notified, the court may so order. (p. 273.)

7. EMINENT DOMAIN—CONDEMNATION OF LAND—PARTIES—NOTICE —INFANTS.

The guardian of the infant owner, if there be one, must be notified, and as such he has a right to appear and make any and all proper defence for and on behalf of his ward. (p. 273.)

8. EMINENT DOMAIN—CONDEMNATION OF LAND—PARTIES—NOTICE —INFANTS.

If such appearance and defence be not made by such guardian, then the court should appoint a guardian *ad litem* to defend his interest, neither being in the strict proper sense a party to the suit. (p. 273.)

9. EMINENT DOMAIN—CONDEMNATION OF LAND—PARTIES.

Where there are adverse or conflicting claims to the real estate proposed to be taken, the claimants must be made parties to the proceeding. (p. 275.)

10. EMINENT DOMAIN—CONDEMNATION OF LAND—PARTIES.

But their conflicting claims should not be litigated until after the condemnation proceeding is ended. (p. 275.)

11. EMINENT DOMAIN—CONDEMNATION OF LAND—PARTIES.

Each owner of each parcel has a right to a separate trial and finding, though all may be embraced in one application. (p. 275.)

12. EMINENT DOMAIN—CONDEMNATION OF LAND—PARTIES.

Where there are two or more conflicting claims to the same parcel, and more than one demands a trial by jury, such trials must be at one and the same time before the jury. (p. 275.)

13. EMINENT DOMAIN—CONDEMNATION OF LAND—JURY.

The jury of 12 guaranteed by the constitution as well as the 5 commissioners, required by the statute, must be freeholders. (p. 275.)

14. EMINENT DOMAIN—CONDEMNATION OF LAND—JURY.

And the order impanelling the jury should in some way either expressly or by necessary implication show that the 12 jurors selected, impanelled and sworn are freeholders. (p. 275.)

15. EMINENT DOMAIN—CONDEMNATION OF LAND—JURY—VIEWING THE PREMISES.

The parties have a right to have the premises viewed by the jury as well as by the commissioners for the ascertainment of facts before rendering their verdict. (p. 272.)

16. EMINENT DOMAIN—CONDEMNATION OF LAND—AD QUOD DAMNUM.

The question, whether two tracts are so connected physically or by use for one common purpose or otherwise as to constitute "one tract" within the meaning of the statute with reference to ascertainment of compensation for damage to the residue, is a question of fact for the jury under the direction of the court as to the law. (p. 272.)

17. EMINENT DOMAIN—CONDEMNATION OF LAND—AD QUOD DAMNUM—NEW TRIAL.

Where there is evidence tending to show two tracts thus made one within the meaning of the statute, the exclusion of evidence otherwise competent tending to show the amount of damages to the residue of the tract by reason of the taking of the part taken,

for the purpose to which the part thus taken is to be appropriated, is error for which a new trial should be granted in an otherwise proper case. (p. 272.)

*Geo. S. Couch* for plaintiffs in error cited Const. W. Va. Art. III, s. 9; Code, c. 42, s. 7; 13 Wall. 187; 20 How. 219; Code, c. 42, s. 6; 17 W. Va. 834; Code, c. 52, s. 7; 17 W. Va. 812; Code, c. 42, s. 17; Id. s. 21; 8 Otto 407; 23 W. Va. 406; Id. 421; 49 Ia. 672; 27 Wis. 188.

*Brown, Jackson & Knight* for defendant in error cited 9 How. 530; 20 How. 219; 8 Mod. 305; 6 Serg. & R. 315; 13 Wall. 187; 2 Tuck. Comm. 331; Code, c. 42, s. 7; Code, c. 52, s. 7; Code, c. 42, s. 23; 15 Minn. 230; 78 Ill. 530; 23 W. Va. 406; 25 W. Va. 226; 27 W. Va. 306.

HOLT, JUDGE:

This is a proceeding to take private property for public use, which resulted in a condemnation, for the purpose of erecting a bridge, of part of lot No. 2, fronting on the south side of Kanawha St. eleven feet three inches, and extending thence to low-water mark on the north bank of Kanawha river, at the city of Charleston, being a part of the "Kelly lot," the property of defendants; and the case is here on appeal allowed defendants.

The proceedings on the part of the bridge company were instituted and conducted according to chapter 42 of the Code of 1891. Article III. § 9, of the State constitution (1872) provides: "Private property shall not be taken or damaged for public use without just compensation. * * * The compensation to the owner shall be ascertained in such manner as may be prescribed by general law; provided that, when required by either of the parties, such compensation shall be ascertained by an impartial jury of twelve freeholders."

After the five commissioners appointed in this case under chapter 42 of the Code had reported the compensation for the "land proposed to be taken and for damage to the residue of the tract," (section 14, c. 42) the defendants, Mary E. Comstock, the widow of Dr. L. L. Comstock, deceased, and Laura L. Comstock and others, his heirs at law, all

infants, demanded trial by jury. The jury was impanelled, and the trial had resulting on 12th December, 1890, in a verdict for two hundred and twenty six dollars and sixty six cents for the part taken, "lot No. 2 of Kelly lot," and the damages to the residue of the tract.

The main point of dispute before the jury was: Is the "Comstock home lot" on the north side of Kanawha street, thirty nine feet wide, and the Kelly lot opposite, on the south side of the street and the north bank of the river, and running down to the water's edge, one tract, within the meaning of the statute, so that when a part of the Kelly lot was taken the home lot would be a part of the residue?

On this question a great deal of evidence was submitted to the jury, tending, as we think, in a clearly appreciable degree, to show—for that is all that need be said now—that these two small parcels of land, although acquired at different times, had unbroken physicial continuity, unless the easement of Kanawha street was such breaking, and that Dr. Comstock had in his lifetime devoted them to the one common purpose of a home for himself and his family, and during his lifetime put them to such use, and no part of either to any other use; that he had spent on the home lot eight thousand dollars or ten thousand dollars in remodelling and building anew the present dwelling house, with that purpose and common use in view; and that since his death the widow and heirs at law have continued to so use them, and for no other purpose whatever. The old buildings on the Kelly lot had been by Dr. Comstock torn down and removed. No new ones of any kind had been erected, and the river bank lot was not inclosed. We do not intend by this to intimate in any degree our opinion on this important point further than is stated above.

What the jury of inquest saw for themselves when they went on the ground to make their view, as they are presumed to have done, other than can be ascertained from the certificate of evidence or facts proved, does not appear; but, that there may be no mistake as to what the evidence tended to prove, I here give it, as set out in the bill of exceptions, omitting the copies of the Comstock deeds, simply giving their dates—there being in this case no question of conflicting claim:

"BILL OF EXCEPTIONS. Charleston and South Side Bridge Co. vs. Mary E. Comstock and others. ON PROCEEDINGS TO CONDEMN REAL ESTATE.

"Be it remembered that on the trial of the above case before the court and a jury, upon the question of amount of compensation to be paid to the defendants Comstock for the real estate sought to be taken by the applicant in this proceeding, as well as damages to the residue of such real estate beyond the peculiar benefits that will accrue to such residue from the work to be constructed, the applicant proved that it is an incorporated company engaged in the construction of an iron bridge across the Kanawha river for public purposes, and that the north terminus of said bridge and its approaches are in the city of Charleston, extending back from the said river to Virginia street in said city, and is supported by stone piers, pedestals, and abutments; that the street in said city next to and parallel to said river is Kanawha street, and that the next street back from Kanawha street, and parallel thereto, is Virginia street, and that the said bridge, its abutments, pedestals, *etc.*, north of said Kanawha street, and between said street and Virginia street, are wholly upon what is known as the 'Rogers Lot,' owned by said applicant, and that no part of said bridge, its piers, pedestals, or abutments, are or will be in or upon the alley hereinafter mentioned;—that the property sought by this proceeding to be actually taken, and as to which the jury was sworn, consists of a strip twenty three and a half feet wide, and extending from low water mark of said river on the north side thereof, to the south side of said Kanawha street, and upon a part of which is now constructed one of the stone piers of said bridge.

"And the applicant further introduced evidence tending to prove that the value of said strip of land ranged from ten to twenty dollars per front foot on said Kanawha street, and proved that the lower portion of said strip, eleven and three fourths feet in width, was claimed by one W. D. Stratton and also by the said defendants Comstock, and that the upper portion of said strip, to wit, eleven feet and three inches, is the property of the defendants Comstock.

"And the said defendants Comstock—that is, Mary E.

Comstock, the widow, and the children and heirs at law of L. L. Comstock, deceased, to fix and establish the damages that will accrue to the residue of their real estate beyond the peculiar benefits that will accrue to such residue from the taking of the upper portion of said strip on the river bank, that is, eleven feet and four inches, extending from Kanawha street to low water mark of said river, for the purpose to which the part to be taken by said applicant is to be appropriated—proved :—That in 1869 the said L. L. Comstock purchased of one Sally McFarland a lot in said city immediately above and adjoining the said Rogers lot, fronting on the north side of Kanawha street, and fronting thereon about sixty eight feet, and extending back by parallel sides to Virginia street. That, at the time of said purchase, there was an old-fashioned brick residence on said lot, and that the said lot was occupied and used as a residence lot by the said L. L. Comstock and his family up to the time of his death, in 1886, and since that time has been and still is so used by the said widow and heirs at law of the said L. L. Comstock, and for no other pvrpose whatever. That in the year 1882 the said L. L. Comstock purchased what is known as the 'Kelly Lot,' on the river bank, abutting on said Kanawha street, on the south side thereof, sixty feet, from the lower portion of which lot the land in controversy in this case is sought to be taken. That the said L. L. Comstock, at about the same time that he bought the Kelly lot, also purchased two other lots on the river bank, abutting on said Kanawha street, on the south side thereof—the first known as the 'Chambers Lot,' with a frontage on said street of about forty feet, immediately above and adjoining the said Kelly lot; and the other known as the 'Dandridge Lot,' abutting on the south side of said street about thirty five feet, immediately above and adjoining said Chambers lot. That the deeds to said McFarland lot and to said river bank lots were then read in evidence, and are in the words and figures following, to wit : Sally M. McFarland to Lucius L. Comstock, deed for home lot, dated 20th October, 1869 ; W. A. McCorkle, Spec. Comm., to L. L. Comstock, deed for Kelly lot, dated 29th June, 1885 ; V. A. Gates, Com. of school lands, *etc.*, to L.

L. Comstock, for Kelly lot dated 19th November, 1885; E. B. Knight and W. S. Laidley, assignees of John P. Hale, to L. L. Comstock, for the Chambers house and lot, dated 16th day of May, 1882. That J. H. Rogers, who then owned and occupied as a residence a house and lot on the north side of said Kanawha street, herein called the 'Rogers Lot,' next below and adjoining the said lot acquired by the said Comstock from McFarland, purchased of the assignees of J. P. Hale a lot on the south side of said Kanawha street, adjoining on the lower side said Kelly lot, with a frontage on said street of about fifty or sixty feet. That each of the said four lots on the south side of said Kanawha street extended from said street to low water mark of said river. That the sole object and purpose of the said Comstock, as well as the said Rogers, in purchasing the said lots on the south side of said street, was to tear down and remove from them the old and unsightly houses that had formerly been upon them, and to prevent nuisances on said lots, and to add to and give an unobstructed view from the dwelling of the said Comstock and Rogers on the south side of said street, and to prevent the construction of buildings thereon in the future. That as soon as said lots on the south side of said street were acquired by the said Comstock and Rogers, as aforesaid, all of the old buildings were removed therefrom by the said Comstock and Rogers, except a small frame cottage on the upper or Dandridge lot, aforesaid, opposite the Houser residence, which residence is on the north side of said street, and on the lot next above and adjoining the said Comstock's McFarland lot. That said cottage had a privilege of mooring coal boats and barges in front of said lots on the bank—was rented out by the said Comstock in his lifetime, and has since been rented by his said widow. That no use whatever has been made by the said Comstock in his lifetime, or by his widow and heirs since his death, of any portion of any of said lots on the south side of said street, except as aforesaid and as hereinafore stated. That in the year 1890 the said Rogers sold his residence lot aforesaid, as well as his said lot on the south side of said street, to the applicant, for bridge purposes. That directly after the said lots on the south side

of said street were acquired and cleared off, as aforesaid, the said L. L. Comstock remodelled the dwelling house upon the said McFarland lot at a cost of from eight thousand dollars to ten thousand dollars. The said dwelling was completed in 1885. That before said river bank lots were purchased by the said Comstock and Rogers, as aforesaid, they were owned by different persons, and were covered with unsightly buildings, which at times were occupied by a very objectionable class of people. That the said defendants Comstock also proved that the approach to said bridge on the north side of said street is to be a solid embankment of earth and masonry about half way from Virginia to Kanawha street, and the balance of the way on to said Kanawha street said approach is supported by iron supports on stone pedestals. That, where said bridge crosses said Kanawha street, it leaves a crossing of fourteen feet in height in the clear. That a stone pier stands parallel to said Kanawha street, on the south side thereof and about twenty five feet therefrom, which pier is about twenty eight feet wide and thirty five feet high, above the surface of the ground, which pier stands partly upon the portion of the said Kelly lot owned by the said defendants Comstock. That the superstructure of said bridge will pass within twenty feet of the said Comstock's dwelling. The defendant also put in evidence a plat showing the land in controversy, as well as adjoining property, upon which plat the Comstock property is marked 'Comstock.'

"And it was further proved that the said Rogers lot and the said Comstock-McFarland lot, on the north side of said Kanawha street, have been owned by different persons for a great number of years, and that there is an alley between said lots ten feet wide, one half of which was taken from each of said lots, and the said alley is a private alley appurtenant to said two lots. The said two lots ever have been owned and occupied by different people for nearly forty years, and the middle of said alley is the dividing line between said lots ; and that the land on the south side of Kanawha street proposed to be actually taken is bounded on the upper side by the said division line, extended to said river at low water mark.

"And it was further proved that the said City of Charleston is an incorporated city, and has been so for many years, and that the said Kanawha street has been a public street in said city for more than fifty years, and is now, and has been for many years, one of the most prominent streets in said city; that said street in front of the Comstock residence, aforesaid, is thirty nine feet wide, including a seven foot sidewalk on each side, and has been worked and controlled by said city, as one of the public streets thereof, ever since the town was laid out, to wit, upwards of sixty years, and that both sides of said street had for sixty years prior to 1882 been at that point closely bulit up with residences owned and occupied by different persons from those owning and occupying the properties on the opposite side of said street, which residence fronted on said street and had their only access therefrom; and that said lots have ever since said purchases laid out uninclosed, and no improvements placed thereon, and consist of the brow of the river bank, extending from the south side of said Kanawha street to low water mark of said river.

"And thereupon the said defendants Comstock introduced A. M. Scott, J. E. Dana, and other witnesses to prove, and sought and offered to prove by them, that the taking of the upper portion of the said parcel of land belonging to them, on the south side of Kanawha street, and appropriating it to the purpose of constructing thereon a bridge, as proposed by the applicant, would depreciate and injure the value of the residence of the said defendants Comstock, on the north side of said street, to the amount of ten thousand dollars, to the introduction of which testimony the applicant objected, which objection is sustained by the court; and the court refused to permit such testimony, or any testimony as to any damages to the said Comstocks' residence, from the taking of said portion of said lot on the south side of said street for the purpose aforesaid, to go to the jury, to which judgment and finding of the Court the said defendants Comstock except, and pray that this, their bill of exceptions, may be signed, sealed, and saved to them, and made part of the record in this case, which is accordingly done."

There is no law or rule of public policy forbidding the owner from devoting and using two such lots for the sole purpose of a home. The question whether the two make one tract is in such a case a question of fact to be determined by the jury after a view of the premises, under the instruction of the Court, if any be given. Especially is this so with us, as the jury as well as the commissioners are required, if either party demands it, to view the premises for the ascertainment of the facts in this proceeding, as well as to hear any proper evidence which is offered. Section 14, c. 42, Code; *Renwick* v. *Railroad Co.*, 49 Ia. 672. And on this trial I infer this was the only fact in dispute, as necesssary in order to ascertain the compensation.

At the first opportunity, these infant freeholders demanded the ascertainment of this fact by "an impartial jury of twelve freeholders," according to their right—thought important enough, as to the method of trial, to be put in the constitution of the State. They insisted at the trial that the ascertainment of this fact should be left to the jury, excepted to the ruling against them, and assign it as error, and insist upon it in argument.

Under the application of the proper rules of law the ascertainment of the fact, whether these two lots were one tract or two tracts, within the meaning of the statute, as to compensation for the part taken and for damages to the residue of the tract, was for the jury; and the evidence offered and rejected was therefore material and competent, so that the verdict must be set aside and a new trail awarded. This must be done if such evidence is conflicting, and for a much stronger reason if such evidence or the facts proven are undisputed.

But as upon another trial what the counsel on both sides term "formal questions," as distinguished from the main substantial questions, may again arise, the former can be now usefully passed upon. They are eight in number, and affect, not the compensation and damages, but the manner of ascertaining them, complained of by defendants.

1. *The infant defendants should have been served personally with notice.* The practice in this State has not been

been uniform. In some circuits the rule has been to require personal service on infants who have attained the age of discretion—say fourteen years and upwards; but in ordinary cases it is not regarded as necessary, because a guardian *ad litem* is always appointed, whether the infant has been served with process or not, "and after such appointment no process need be served on such infant." Section 13, c. 125, Code. See *Parker* v. *McCoy*, 10 Gratt. 594–606 (1854). The object of serving the process or notice upon the infant of the age of discretion was to give him an opportunity to look after his interests himself, and even then it was not uncommon to serve it on his father or other natural guardian expressly as service on him. Here the statute, wisely I think, expressly requires that "if the owner be under disability, and there be a guardian or committee for him, such guardian or committee shall be notified; but if there be no guardian or committee, or if any such owner or person be unknown, the court shall appoint a guardian *ad litem* to defend their respective interests." When this section 7 is read with section 6, it clearly appears that as to the infant owner the notice shall be served on the guardian, and as to owners not in the county or unknown to the applicant, by four weeks' publication of the notice. When these two sections are read together, the provision that ten days' notice shall be served on the said owners, followed as it is as to the mode of service on unknown owners and owners under disability, they indicate that the notice should be served personally on the infant.

2. *The Circuit Court erred in refusing to allow Mary E. Comstock, as guardian, to become a party to the proceeding.* This, I think, should have been allowed—*First,* because the law required her to be notified for some purpose; *second,* because she had the custody of her wards, and the possession, care and management of their estate, real and personal, including the land in question, and was entitled to receive as guardian any compensation which might be awarded them. See section 7, c. 82, Code.

This being the sale *in invitum,* as we may say, of an infant's land, to make or permit the guardian to become a party in that character would be in keeping with the law

in case of ordinary sales of the lands of infants.   See Code,
c. 83, ss. 1–12.   The appointment of the guardian or of
some other fit person as guardian *ad litem* could certainly
do no harm in any case where not forbidden, and he is not
regarded as a party to the suit.   I think the mother, as
guardian, had a right to be heard for her ward in this pro-
ceeding.

3. *The petition of the applicant failed to allege that the
applicant could not agree with the owners of the land when
known*, although the necessity of making such allegation
would seem to be implied from the reading of section 7, c.
52.   Still I think such allegations unnecessary, for the fol-
lowing reasons:   *First.* Chapter 52 in our present Code
represents chapter 56 in the Virginia Code of 1849 (Ed.
1860, p. 322, c. 56, § 6) and chapter 42, Code W. Va., is not
only the last law, in one sense, on the subject, but it is de-
voted to the subject "of taking land without the owner's
consent for purposes of public utility."   That is the title
and the subject-matter of chapter 42.   *Second.* The fifth
section of this chapter requires the application to be in writ-
ing; to describe the land proposed to be taken with reas-
onable certainty, stating, so far as known, the names of the
owners and the nature of the interest, the liens on the land,
if any, and name and residence of the lienor, the purpose
to which the estate is intended to be appropriated, "and
may state the sum of money which the applicant is ready
to pay therefor to the owner of each parcel."   Section 9, same
chapter, says: "If the applicant has stated in his applica-
tion the sum of money he is ready to pay," *etc.*, "then it is
treated as a standing offer which may be accepted," *etc.*

I regard section 5 of chapter 42 as exhaustive of what
the application shall state, at least in the case of infants
who can not agree.   I observe that Mr. Hutchinson who
has evidently given the whole subject careful consideration
"in his useful work" W. Va. Justices § 675 does give in his
form of "petition to condemn land" the allegation, "your
petitioner further represents that he is unable to agree with
the owners," *etc.*   This would seem to be required by im-
plication from section 7, c. 52, if that were the only law
upon the subject.   If certainly does no harm, might be

useful in many cases, but is not necessary when the owner is an infant.

4. *The court erred in striking out paragraphs 3 and 4 of defendants' answer.* The defendants state in substance, that their co defendant, W. D. Stratton, has no valid claim to any of this land, and deny that any portion of the real estate described in plaintiff's application is owned by any one but themselves. I take this to mean that at this stage of the proceeding the conflicting claims to the land sought to be condemned can not be litigated and settled. That is reserved until the money is paid into court and is to be disposed of. Then the court proceeds to ascertain what persons are entitled thereto. Code, c. 42, s. 23. I see no error in thus postponing a question which has nothing to do with the matter of condemnation and compensation.

5. *The commissioners do not state in their report that they took into consideration the question of damage to the home-place across the street.* The case has gone to a jury. On that point the action of the commissioners has been superseded, and at this stage, except as already discussed on the motion for a new trial, is a mere moot point.

6. *The court erred in compelling the defendants Comstock to submit to a joint trial before a jury with defendant W. D. Stratton.* The record does not bear out this assignment, but on the contrary shows affirmatively and by name that the case was not tried by the jury as to defendant Stratton, but as to the defendants Comstock alone. That the subject-matter of the trial was made to include separately lot No. 1, also claimed by Stratton, was for the purpose of meeting the contingency that defendants Comstock might afterwards ascertained to be entitled to the compensation found by the jury for lot No. 1.

7. *It nowhere appears that the jury were freeholders, as required by the constitution.* The writ of inquiry *ad quod damnum*, regulated from time to time by statute, is a proceeding of long standing and frequent use, as may be seen by the Code of Virginia (1860) c. 56, and references to old statutes. See *Pitzer* v. *Williams*, 2 Rob. (Va.) 253; *Collison* v. *Hedrick*, 15 Gratt. 244. It is a general rule that he who

seeks to exercise the extraordinary power of taking private property for public use must follow strictly the mode of procedure prescribed by law. *Supervisors* v. *Stout*, 9 W. Va. 703. But I take it that when, upon a fair and reasonable construction of the inquisition (and proceedings) it is substantially responsive to the requirements of the statute, that is sufficient. *Mairs* v. *Gallahue*, 9 Gratt. 94; *Railroad Co.* v. *Foreman*, 24 W. Va. 662. I think this assignment of error not well taken—*First*, because the record shows that the jurors were selected according to law, as well as impanelled and sworn; and, *second*, because the point was at no time made in the court below, where it could have been inquired into and corrected, if as to any juror found not to be true. Our grand juries are required to be composed of freeholders, yet in such cases involving life and limb the statute provides that no indictment shall be quashed or abated on account of the incompetency or disqualification of any one or more of the grand jurors who found the same; showing at least that such objections, coming after the inquest had been completed, are no longer looked on with favor in this State. When the jury was impanelled, was the time to speak; and, when the record says they were selected according to law, there is nothing unreasonable in saying that means, *inter alia*, according to the law requiring them to be freeholders. I would have thought, however, that out of abundant caution a word so easy to put in would not be left out. Mr. Hutchinson, in the work already cited, uses the term, "twelve lawful men."

8. *The court erred in not giving judgment for the excess found by the jury above the sum reported by the commissioners.* Code, c. 42, s. 21. The answer is, there is nothing to show that the applicant failed to pay the same. If he paid it into court, there is no occasion for giving any judgment for such excess. Still the record should show that at some time during the proceeding the money had been paid into court, as the vesting of the title or right to the possession may depend upon such payment. Code, c. 42, ss. 18, 20, 22; Hutch. W. Va. Justices, pp. 432–472. I see in this record no final order confirming this verdict and ordering it to be recorded. That may be done at any

time within three months after the verdict. The verdict was found 12th December, 1890. The writ of error without *supersedeas* was granted 26th September, 1891. The last order here shown is the one overruling defendants' motion to set aside the verdict of the jury, and award them a new trial.

In what has been said in setting aside the finding of the jury and awarding a new trial, no opinion is given or intended to be intimated, that, if the jury should find these two parcels to be one tract, therefore they should ascertain as compensation for damages done to the home-lot the damage done by that part of the bridge or viaduct built wholly on plaintiff's own land or on the land of a stranger. That question is nowhere presented in the record in any form, or in assignment of errors or in briefs, and is not here discussed or decided.

Verdict set aside and new trial awarded.

REVERSED.  REMANDED.